**FILED**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**

AUG 2 0 2018

U.S. DISTRICT COURT-WVND
WHEELING, WV 26003

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* KAREN CHAMPION,<br><br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>ANWAR EYE CENTER, Inc., ANWAR CATARACT CENTER, M F ANWAR MD INC, DR. BRETT K. RADOW, O.D., and DR. MOHAMMAD F. ANWAR, M.D.,<br><br>　　　　　　　　Defendants. | Case No. 5.18 CV-136<br>Stamp<br><br>**QUI TAM COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729,** *et seq.*<br><br><br>**UNDER SEAL Pursuant to 31 U.S.C. § 3730(b)(2)** |

## NATURE OF THE CASE

1.　　*Qui tam* Relator Karen Champion ("Relator") brings this action under the federal False Claims Act, 31 U.S.C. § 3729, et seq. (the "FCA") on behalf of the United States of America (the "Government") against Defendants Anwar Eye Center, Anwar Cataract Center, M F ANWAR MD INC, Dr. Brett K. Radow, OD, and Dr. Mohammad F. Anwar, MD (collectively, "Defendants") to recover funds Defendants have defrauded from the Government run healthcare programs Medicare and Medicaid. Relator's allegations are based upon her own knowledge and on an investigation by Counsel undertaken on her behalf. In support of her claims, Relator alleges the following.

2.　　As more fully described below, Dr. Anwar and the other Defendants routinely and systematically engaged in the following types of fraud: a massive kickback scheme, including

the payment by Dr. Anwar of *hundreds of thousands of dollars in cash* to optometrists in order to induce them to refer patients to Dr. Anwar's ophthalmology practice, and fraudulently billing Medicare for thousands of cataract surgeries performed on elderly patients whose condition did not meet Medicare's strict definition of medical necessity.

3.      Overall, Defendants' fraudulent schemes have defrauded the Government out of literally millions of dollars in taxpayer funds in violation of the FCA.

## JURISDICTION AND VENUE

4.      Relator brings this action on behalf of the United States under the *qui tam* provisions of the FCA.

5.      This Court has subject matter jurisdiction pursuant to 31 U.S.C. §§ 3732(a) and (b), which confer jurisdiction over actions brought under 31 U.S.C §§ 3729 and 3730.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

6.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found, reside, and/or transact business in this District and because acts proscribed by 31 U.S.C. § 3729 occurred within this District.

7.      Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c), and 31 U.S.C. § 3732(a), because most of the Defendants reside in this District, and most of the events or omissions giving rise to the violations of 31 U.S.C. § 3729 alleged in the Complaint occurred in this District.

8.      This action is not based upon the prior public disclosure of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party, in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation, in the news media, or in any other form as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A).

9.      To the extent there has been a public disclosure unknown to Relator, she is an original source under 31 U.S.C. § 3730(e)(4)(B).

## PARTIES

10.     Relator Karen Champion ("Relator") is a citizen of the United States, and a resident of the city of Moundsville, West Virginia. Relator is a Certified Registered Nurse Anesthetist (a CRNA). CRNAs are RNs with an advanced degree, also known as APRNs (Advanced Practice Registered Nurses). CRNAs administer anesthesia and other medications. They also monitor patients who are receiving and later recovering from anesthesia. In order to become a CRNA, an RN must have a Master's degree in anesthesia, completed additional extensive clinical training in anesthesia, and passed a certification exam approved by the National Boards of Certification and Recertification of Nurse Anesthetists (NBCRNA).

11.     Relator worked for Dr. Anwar as a surgical CRNA for over 20 years. First, from 1993 - 2003, and then, after taking a break to work for two years in North Carolina, she came back to West Virginia and worked for Dr. Anwar a second time, from 2005 - 2015.

12.     Defendant Dr. Mohammad F. Anwar ("Dr. Anwar") is a practicing ophthalmologist who works and resides in the State of West Virginia. Dr. Anwar received his medical training in Pakistan where he graduated from King Edward Medical College, University Of The Punjab in 1960. Dr. Anwar has been practicing ophthalmology in West Virginia for over 48 years.

13.     Defendant Anwar Eye Center, Inc. ("AEC"), a West Virginia corporation, which is also known as the Anwar Cataract Center ("ACC"), is an ophthalmology practice, as well as an ambulatory surgical center that specializes in cataract surgeries. The sole owner of AEC, and the only ophthalmologist who works, or has ever worked, at AEC is Dr. Mohammad F. Anwar ("Dr. Anwar"). AEC's main office and surgical center is located at 1500 Lafayette Avenue,

Moundsville, West Virginia. Upon information and belief, Defendant MF Anwar MD Inc, a West Virginia corporation, is affiliated with and involved in with the operations and management of AEC.

14.   Dr. Anwar has owned and operated the AEC for almost 30 years, since he first opened it in 1990.  The AEC currently has two satellite offices. One is located at RR 3 3166, Keyser, West Virginia. The other is located at 1900 Main Street, Sutton, West Virginia. While the AEC currently has two satellite offices, during its almost three decades of existence, Dr. Anwar has opened and closed over a dozen AEC satellite offices throughout the State of West Virginia. Dr. Anwar's main office and surgical center - the place where he performs all of his cataract surgeries - is and has always been located in Moundsville, West Virginia.

15.   Dr. Anwar is a prodigious performer of cataract surgeries. AEC's official website states the following: "Dr. Anwar at the eye care center removes more cataracts than anyone in the Tri-State area, including Pittsburgh." http://anwareyecenter.com Not only that, over the last 25 years, there is no other doctor who has even come close to performing as many cataract surgeries in the State of West Virginia as Dr. Anwar has. Since cataracts are a condition that predominantly strike the elderly, it is no surprise that Medicare pays for the vast majority of cataract surgeries Dr. Anwar performs and that Medicare has paid him more money for performing cataract surgeries that just about any other ophthalmologist in West Virginia.

16.   Dr. Brett K. Radow, O.D. ("Dr. Radow") is a practicing optometrist who resides and works in the State of West Virginia. He graduated from Southern College of Optometry in 1980, and has practiced continuously since then. Dr. Radow is a solo practitioner with his main office located at 149 Main Street, Spencer, West Virginia. Dr. Radow has a second office near Charleston, West Virginia. The address of this second office is 2700 E Dupont Ave, Belle, WV.

Dr. Radow predominantly treats elderly patients, many of whom are covered by Medicare. Accordingly, Dr. Radow regularly receives reimbursement from Medicare for care and services he provides to his patients who are also Medicare beneficiaries.

17.     The United States of America is the real party in interest under the FCA as it is the one who ultimately paid the false claims alleged herein through the Medicare program, a federal health insurance program administered by the Centers for Medicare and Medicaid Services ("CMS") on behalf of the elderly and disabled, 42 U.S.C. §§ 1395-1395hhh, and the Medicaid program, a jointly funded federal and state public assistance program administered by CMS and the State of West Virginia which pays for medical services for certain qualified low income people, 42 U.S.C. §§ 1396-1396v. The United States is thus entitled to the bulk of the recovery sought by this action.

## STATUTES, RULES AND REGULATIONS

### A. The False Claims Act

18.     The FCA imposes liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim to the government for payment of money (a "false claim"). 31 U.S.C. §3729(a)(1)(A). The FCA defines "claim" to include any request or demand, whether under contract or otherwise, for money that is made to an agent of the United States or to a contractor if the money is to be spent to advance a government program or interest and the government provides or will reimburse any portion of the money. 31 U.S.C. §3729(b)(2). Requests for reimbursement sent to Medicare or Medicaid are considered "claims" under the FCA.

23.     The FCA defines "knowingly" to mean actual knowledge, deliberate ignorance of truth or falsity, or reckless disregard of truth or falsity. Specific intent to defraud is not required. 31 U.S.C. §3729(b)(1).

- 6 -

24.     The FCA also imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim (a "false statement"). 31 U.S.C. §3729(a)(1)(B). The FCA defines "material" to mean having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. §3729(b)(4).

25.     The FCA provides for the award of treble damages and civil penalties for knowingly submitting or causing the submission of false or fraudulent claims for payment to the government or for making or using false statements material to false or fraudulent claims paid by the government. 31 U.S.C. §3729(a)(1)(2).

### B. Government Healthcare Programs

#### 1) Medicare

26.     Medicare is a federal health insurance program created by Congress in 1965 for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395hhh.  It is the nation's largest health insurance program covering almost 45 million people.  Medicare is administered by a federal agency called the Centers for Medicare and Medicaid Services ("CMS"). Medicare pays doctors, as well as hospitals, pharmacies, and other types of healthcare providers for their goods and services according to conditions and rates established by the government.  *Id.*

27.     Medicare is divided into several parts, two of which, Medicare Parts B and C, are relevant to this case. Medicare Part B authorizes the payment of federal funds for medical and other outpatient health services, including physician services, supplies, and services incident to physician services. Medicare Part B also covers payments for services provided by properly accredited, and Medicare approved ambulatory surgical centers. 42 U.S.C. §§ 1395-1395(k).

28.     If a patient qualifies for the procedure, Medicare Part B authorizes CMS to pay for cataract surgeries and the lenses used in such surgeries. Medicare Claims Processing Manual,

ch. 14, § 40.3. As of January 1, 2008, the procedure and lens are paid in a single lump sum. Id. The most common CPT codes associated with cataract surgeries are 66982 and 66984. For each of these codes, there is a facility services fee which is paid to the surgical center where the procedure is performed, and a professional services fee, paid to the physician for the surgery performed. Both the facility services fee and the professional services fee are paid for by Medicare Part B.

29.     Medicare Part C, otherwise known as Medicare Advantage Plans, is Medicare's managed care option. Under Part C, CMS contracts with public or private organizations, such as Blue Cross Blue Shield, to offer a variety of health plan options for beneficiaries. Qualified Medicare eligible individuals may then "opt out" of traditional fee-for-service coverage under Medicare Parts A and B and enroll in privately-run managed care plans that provide coverage for both inpatient and outpatient services under Medicare Part C. The extent to which physician's services and surgical procedures are covered under Part C is determined by the individual patient's particular Medicare Advantage plan.

30.     The Department of Health and Human Services ("HHS"), an agency of the United States government, is responsible for the administration of the Medicare and Medicaid programs. HHS has delegated the administration of these programs to its component agency, the Center for Medicare and Medicaid Services ("CMS").

### 2) Medicaid

31.     The Medicaid program was created in 1965 as part of the Social Security Act. It authorizes federal grants to states for medical assistance to low-income persons, blind, disabled, or members of families with dependent children or qualified pregnant women or children. The Medicaid program is jointly financed by the federal and state governments. CMS administers Medicaid on the federal level. Within broad federal rules, each state decides eligible groups,

types, range of services, payment levels, and administrative and operating procedures. The states directly pay providers, with the states obtaining the federal share of the payment from accounts which draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.30. The federal share of each state's Medicaid expenditures varies by state. Importantly, reimbursement requirements and practices under Medicaid closely align with the specific rules and regulations for government reimbursement under Medicare.

32.     By participating in the Medicaid program, providers agree to abide by all laws, regulations, and procedures applicable to that program, including those governing reimbursement. Similar to the requirement for obtaining reimbursement through Medicare, Medicaid only pays providers for services that are rendered, as represented on the claim form, and that are reasonable and necessary.

### C. Reimbursement Rules for Claims Made to Government Healthcare Programs

33.     Medicare and Medicaid only pay for those services that are medically necessary for the treatment of illness or injury. This standard is the basic, bedrock principle behind the decision whether any Government Healthcare Program will pay for a medical service. This principle is so central to the Government Healthcare Programs that, in order to be paid, healthcare providers, including Defendants, must certify that the services for which they billed the Government were medically necessary.

34.     In addition, healthcare providers must also certify that they have complied with all Medicare rules and regulations in order to qualify (be eligible) for the Medicare program, including that they have not violated the federal Anti-Kickback Statute. *See* Form CMS 855A and Form CMS-1500. Thus, in order to participate in the Medicare program, all healthcare providers, including Defendants, must have submitted a Medicare Enrollment Application on Form CMS 855A.  This form stipulates that providers agree to be familiar with, and abide by, the

program's reimbursement policies. In particular, here, when Defendants submitted their Medicare Enrollment Applications, Defendants certified to the following requirements:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . .
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

35.     Defendants falsely certified in their annual provider enrollment applications that they were knowledgeable regarding Medicare's requirements and would not knowingly or recklessly submit false claims for payment, which includes payments for services that were not medically necessary to treat illness or injury or were not actually performed as Defendants said they were and that no kickbacks were paid or received in violation of the Anti-Kickback Statute.

36.     Once enrolled in Medicare, in order to be paid for services rendered, all healthcare providers, including Defendants, must submit a Medicare Health Insurance Claim Form, known as Form CMS-1500 with respect to each request for reimbursement. This form mandates that the healthcare provider identify with specificity the service provided to the patient and requires that the healthcare provider also certify that the services were "medically indicated and necessary to the health of the patient" and that the healthcare provider has complied with "all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment." Form CMS-1500 (available online at https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf)

37.     Form CMS-1500 also requires the healthcare provider to certify that its request for reimbursement is "true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or

documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws." *Id.*

38.     Part of the information the provider includes on a Form CMS-1500 request for reimbursement is a multi-digit code known as the Health Care Financing Administration Common Procedure Coding System ("HCPCS") codes, also known as CPT codes. The codes are a listing of procedures and services performed by health care providers. Health care providers include HCPCS codes on the CMS-1500 claim forms to identify the services rendered, the ones for which reimbursement is sought. Healthcare benefit programs, including Medicare and Medicaid use the specific HCPCS codes in deciding whether to issue or deny payment. Each healthcare benefit program establishes a fee reimbursement amount for each procedure described by an HCPCS code.

## SPECIFIC ALLEGATIONS OF FRAUD

39.     At all times relevant to this Complaint, Dr. Anwar, the AEC, and the ACC were providers of healthcare services to Medicare and Medicaid beneficiaries. They entered into provider agreements with CMS to participate in each of these programs under the terms of those programs. Under the terms of those agreements, Dr. Anwar and the AEC agreed to comply with all of the conditions imposed upon them by applicable federal law and regulations, including the requirement that they submit claims for reimbursement only for services that were done in compliance with the AKS and that the services performed were medically necessary. Dr. Anwar thus knew, or should have been aware of, the conditions for reimbursement of medical services under the Medicare and Medicaid government run healthcare programs when he submitted his requests for reimbursement.

40.     Over the last 10 years (the "relevant time period"), on tens of thousands of separate occasions, Defendants defrauded Medicare and Medicaid by means of presenting, or

causing to be presented, to the Government, knowingly false claims for payment from Medicare and Medicaid for which the Government paid Defendants millions of dollars, in violation of the False Claims Act.

41.     As a direct result of 1) their scheme to pay illegal kickbacks to optometrists in the form of cash and other valuable non-cash remuneration to induce and reward patient referrals, in violation of the AKS and the FCA, and 2) their performance of thousands of medically unnecessary cataract surgeries paid for by the federal healthcare programs Medicare and Medicaid, Defendants Dr. Anwar, the AEC, and the ACC have submitted thousands of false claims to the United States in violation of the FCA. Those false claims have resulted in the Government paying those same Defendants tens of millions of dollars in illegally obtained taxpayer money for the performance of cataract surgeries.

42.     Through these fraudulent schemes, Defendants Dr. Anwar, the AEC and the ACC, have received more money from Medicare for the performance of cataract surgeries, during the relevant time period, than just about any other ophthalmology practice in the State of West Virginia.

**A. Defendants' Illegal Kickback Scheme**

**1) The Anti-Kickback Statute**

43.     The Anti-Kickback Statute ("AKS") prohibits any person or entity from knowingly and willfully offering, paying, soliciting, or receiving any remuneration, directly or indirectly, to *induce or reward* a person for, among other things, purchasing, ordering, arranging for, or recommending the purchase or ordering of any goods or services for which payment may be made, in whole or in part, under a federal healthcare program, including Medicare and Medicaid. 42 U.S.C. §§ 1320a-7b(b)(1) and (2).

44.     The AKS is intended to prevent arrangements that can lead to unfair competition, the distortion of medical decision making, overutilization of services and supplies, and increased costs to federal healthcare programs. To protect the integrity of federal healthcare programs from these difficult-to-detect harms, Congress enacted a per se prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. *See* 65 Fed. Reg. 59,434 and 59,440.

45.     The term "remuneration" as defined in the AKS includes the transfer of anything of value "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1320a-7b(b)(1). When interpreting the applicability of the AKS, the term "remuneration" should be read broadly.

46.     Under the AKS, the knowing and willful *payment* of remuneration, or the knowing and willful *receipt* of remuneration, may violate the AKS when the purpose of the transaction, in whole or in part, is to induce the referral of Medicare or Medicaid business, in this case, patients. Indeed, paying for the referral of Medicare or Medicaid patients is the prototypical example of a kickback that violates the AKS. To put it succinctly, a doctor cannot pay for a patient referral and a doctor cannot accept payment for a patient referral without violating the AKS. Both the payor of a kickback and the recipient of a kickback violate the AKS and the FCA.

47.     Compliance with the AKS is a condition of payment under all federal healthcare programs, including Medicare and Medicaid. All healthcare providers who participate in the Medicare and Medicaid programs, including the Defendants herein, must agree to comply with the AKS when they enter into an agreement with CMS to participate in the program. Also, when submitting claims for reimbursement to Medicare or Medicaid, every healthcare provider,

- 13 -

including Defendants, must certify - on each and every claim form - that the services were not provided in violation of the AKS.

48.     In addition, violation of the AKS can subject the perpetrator to exclusion from the Medicare or Medicaid healthcare programs and to civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and § 1320a-7a(a)(7).

49.     A Medicare or Medicaid claim for reimbursement submitted in violation of the AKS is considered a "false claim" for purposes of the False Claims Act. 42 U.S.C. § 1320a-7b(g).

### 2) Specific Kickback Allegations - Payments to Optometrists

50.     Over his long career, Dr. Anwar has performed more cataract surgeries than just about any other ophthalmologist in West Virginia, probably ever. To this day, as Dr. Anwar himself states on his official AEC website: "Dr. Anwar at the eye care center removes more cataracts than anyone in the Tri-State area, including Pittsburgh." http://anwareyecenter.com

51.     Since cataracts are a disease that predominantly strikes the elderly, it is therefore not surprising that Defendants Dr. Anwar, the AEC, and the ACC have received more money from Medicare for the performance of cataract surgeries than almost any other ophthalmology practice in the State of West Virginia.

52.     However, Dr. Anwar's "success" is not a coincidence. It is a direct result of a massive and illegal kickback scheme.

53.     It is well understood in the eyecare industry, and was certainly well understood by Dr. Anwar, that the primary source of patients who may need cataract surgery are optometrists. Most people see their optometrist first, for glasses or contacts or for general vision care. If the person is 65 or older, it is the optometrist who often recommends an ophthalmologist for the

evaluation and possible treatment of cataracts. Accordingly, Dr. Anwar targeted optometrists for his illegal kickback scheme.

54.     As explained in more detail below, Dr. Anwar pays illegal remuneration to several targeted optometrists, including Defendant Dr. Radow, in order to induce them to refer patients to Dr. Anwar's ophthalmology practice. This illegal remuneration most often takes the form of substantial amounts of cash. Over the last ten years, Dr. Anwar has paid *hundreds of thousands of dollars in cash*, as kickbacks to optometrists. Dr. Anwar has also showered optometrists with other forms of valuable remuneration, such as yearly all-expenses paid trips (including generous amounts of spending money), expensive furniture and landscaping work for the optometrists' offices, and other personal gifts, among other valuable types of remuneration.

55.     The purpose of these illegal incentives is, and was throughout the relevant time period, to induce the targeted optometrists to refer patients to Dr. Anwar and the AEC for the evaluation and possible treatment of cataracts. A very high percentage of the patients the targeted optometrists referred to Dr. Anwar were, and continue to be, Medicare and/or Medicaid beneficiaries.

56.     One of the two people, besides Anwar himself, who hand delivered most of the cash payments to the targeted optometrists is Anita Owens, a former longtime employee of Dr. Anwar. Anita worked as an Office Manager for Dr. Anwar from June 1992 to 2013. During this 20 year time period, Dr. Anwar opened and closed numerous AEC satellite offices - at one point in time, Dr. Anwar had over a dozen AEC offices stretched across the State of West Virginia. Dr. Anwar did not perform cataract surgeries at any of these satellite offices, nor did he see patients at any of these offices. Rather, Dr. Anwar primarily used these offices as conduits to funnel cataract patients to his surgical center, the AEC in Moundsville, WV.

57.    During the 20-year time span that Ms. Owens worked for Dr. Anwar, she was the person in charge of setting up, and then handling all of the administrative functions for any new satellite office Dr. Anwar opened. In this role, Anita got to know a number of West Virginia optometrists quite well. This made Anita well suited for her other major job responsibility for Dr. Anwar: delivering Dr. Anwar's cash kickbacks to targeted optometrists.

58.    The biggest recipient of Dr. Anwar's cash kickbacks, from the time he opened the AEC back in 1990, and continuing right up to the present day, is the Defendant Dr. Radow, an optometrist with offices in Spencer and Charleston, WV. The payments to Dr. Radow illustrate how Dr. Anwar's cash kickback scheme works.

59.    Ms. Owens states that every other week, like clockwork, Dr. Anwar would give her an envelope for Dr. Radow containing $5,000 in cash (for Dr. Radow, Anita says, the envelope always contained $5,000). Dr. Anwar had Anita drive to Dr. Radow's office and have her personally hand deliver the envelope to Dr. Radow.

60.    Anita states that she made these cash payments to Dr. Radow, on Dr. Anwar's behalf, every other week, month after month, and year after year, for many of the 20 years that she worked for Dr. Anwar. Anita states that she gave cash payments to Dr. Radow until 2013, the last year that Ms. Owens worked for Dr. Anwar. The cash payments to Dr. Radow continued after Anita's departure, and, as explained below, continue to this day.

61.    Ms. Owens also states that Dr. Radow had a secretary who helped him manage his office, including patient scheduling. This secretary became an important part of the referral process so, at Dr. Radow's request, Dr. Anwar, through Ms. Owens, also gave envelopes with $1,000 in cash to Dr. Radow's secretary, delivered at the same time that Anita dropped off the cash payments to Dr. Radow.

- 16 -

62.     The cash payments to Dr. Radow were tremendously effective. Ms. Owens describes Dr. Radow as a well-known optometrist in West Virginia; someone who is very friendly and personable with lots of elderly patients. Over the years, Ms. Owens visited Dr. Radow at his office many times, usually with an envelope full of cash, and says she heard him say pretty much the same thing over and over again to his elderly patients: "I'm sending you to the best, Dr. Anwar, in Moundsville, and don't worry he's got free transportation for you!" It was effective. Over the years, Dr. Radow sent thousands upon thousands of elderly patients to Dr. Anwar.

63.     Dr. Anwar paid Dr. Radow more money - cash kickbacks - than any other targeted optometrist precisely because his optometry practice's patients were particularly and heavily concentrated among elderly patients in the central portion of West Virginia, in and around Charleston itself. This benefitted Dr. Anwar tremendously because cataracts are a disease that mostly strike the elderly and, because the elderly are almost all covered by Medicare, a steady and reliable revenue stream for Dr. Anwar.

64.     Relator, in addition to Ms. Owens, can also testify to the existence of Dr. Anwar's extensive kickback scheme. According to Relator, it was generally known, among the people who worked for Dr. Anwar, that he regularly paid cash to optometrists for patient referrals, especially to his most prolific referrer, Dr. Radow.

65.     Over her 20 years working for Dr. Anwar, Relator learned much about the cash and gifts he gave to various targeted optometrists. Relator states, and Ms. Owens confirms, that among Dr. Anwar's more senior employees, the details regarding the kickbacks he paid to targeted optometrists were well known and frequently discussed amongst themselves.

- 17 -

66.     In addition to Ms. Owens and the Relator, other senior employees who witnessed and knew much about Dr. Anwar's kickback scheme, include, but are not limited to, longtime employees Debbie Fox, Brenda Sue Robinson and Cindy Sliva. In fact, for many years until her death in 2015, Debbie Fox was Dr. Anwar's trusted employee and bookkeeper. She handled most of his financial transactions. Most of the time, when a cash kickback was to be paid, Debbie was the one who would get a check from Dr. Anwar, go to the local bank, and return with the cash that would be hand delivered to the targeted optometrist.

67.     The other employee who handled the banking responsibilities for Dr. Anwar was Rebecca Shuman, another longtime employee of his. When Debbie was not available, Rebecca would go to the bank and get the cash for the kickback payments.

68.     While Relator was not involved in actually delivering cash payments to optometrists, Dr. Anwar and others in the office often spoke with her about it, or did so in her presence. Relator clearly recalls one specific instance of a cash kickback given by Dr. Anwar to Dr. Radow. Sometime in 2013, Relator remembers sitting in Dr. Anwar's office at the AEC and watching his longtime bookkeeper, Debbie Fox, bring an envelope filled with cash into the office and hand it to Dr. Anwar. He took the cash out, showed it to Relator, and asked "Do you know how much money this is?" Relator was shocked by the question and asked Dr. Anwar what was going on. She remembers Dr. Anwar matter-of-factly telling her that it was $5,000 and that the money was for Dr. Radow. Dr. Anwar also told her that he had another $1,000 he was giving to Dr. Radow's secretary. Dr. Anwar also wondered out loud whether the payments were "enough money for Dr. Radow to keep sending him patients." He even suggested that maybe he should increase the dollar amount he gives to Dr. Radow in order to receive more referrals from him.

69.     While a substantial portion of Dr. Anwar's cash payments were given to Dr. Radow, he was by no means the only optometrist to whom Dr. Anwar paid cash kickbacks during the relevant time period. Dr. Anwar gave cash kickbacks to several other targeted optometrists as well. Anita Owens states that for many years on a monthly basis, she gave envelopes with around $1,000 in cash from Dr. Anwar to Dr. Stephen C. Hilton, an optometrist in Kingwood, WV.

70.     Relator also learned about the cash kickbacks given to Dr. Hilton. Until Dr. Hilton's untimely death in July 2016 from a car crash, Relator heard from other senior employees about Dr. Anwar's monthly cash payments to Dr. Hilton.

71.     Relator also learned that in or around 2014, Dr. Radow stopped referring patients to Dr. Anwar. Dr. Anwar discussed this topic with Relator quite a bit as he was quite upset about it. Dr. Anwar felt that Dr. Radow was being paid by a competing ophthalmologist and that is why his referrals to Dr. Anwar stopped. In response, in 2014 and 2015, Dr. Anwar began giving cash payments again to Dr. Hilton which caused him to increase the number of patients he referred. This made up some for the lack of patients from Dr. Radow. The kickbacks to Dr. Hilton stopped in 2016, due to Dr. Hilton's death from a car accident.

72.     In 2017, Dr. Anwar approached Dr. Radow again and made a new deal to give cash payments to Dr. Radow. In 2017, as a result of the new kickback arrangement, Dr. Radow once again began to refer numerous patients to Dr. Anwar. The kickback arrangement with Dr. Radow continues to this day.

73.     In addition, Dr. Anwar has a longtime employee, Cindy Sliva, a nurse who worked with him throughout the relevant time period, up to and including the present, who also handles Dr. Anwar's payment of kickbacks to targeted optometrists. Cindy is an outreach

representative for Dr. Anwar, who went around the State of West Virginia doing free eye screenings, on behalf of Dr. Anwar, as a form of marketing for his ophthalmology practice. Cindy also delivered cash kickback payments for Dr. Anwar. During the relevant time period, Cindy delivered cash payments on a regular basis, worth thousands of dollars at a time, to the following targeted optometrists: a husband and wife team of optometrists, Doctors Adrienne and David, Melgary, from Wellsburg, WV; also Dr. James Volk, an optometrist in nearby Steubenville, OH, and also to Dr. Terry Williams, an optometrist in Glendale, WV.

74.     In addition to cash payments, Dr. Anwar also gave substantial amounts of other valuable remuneration to optometrists as an inducement for them to send him patient referrals. At least once a year, Dr. Anwar takes several optometrists on an all expenses paid trip to Las Vegas, New Orleans, San Diego or some other vacation locale. The trips were coordinated with annual Continuing Education (CE) seminars for optometrists set in those locations. Relator knows this firsthand because Dr. Anwar had her go, as part of her job, on three of these trips as well.

75.     In addition to Dr. Radow and his secretary, both of whom usually went on these extravagant trips, Dr. Anwar took a number of other optometrists. For example, he often took along the husband and wife team of optometrists, Doctors Adrienne and David, Melgary, on the trips. Dr. Anwar also took Dr. James Volk and Dr. Terry Williams on the trips as well. All of these optometrists, Dr. Radow, Dr. Adrienne Melgary, Dr. David Melgary, Dr. James Volk, and Dr. Terry Williams, among others, would go every year, for many years in a row, on these lavish, all expenses paid trips. Dr. Anwar would pay for the hotel rooms, the airline tickets, the meals, and even give some of them several thousand dollars in spending money.

76.     In addition to the frequent trips, Dr. Anwar would frequently buy gifts for Dr. Radow, such as furniture and landscaping for his optometrist office in Spencer, WV, as well as trees planted at Dr. Radow's home by Dr. Anwar's own employees.

77.     Overall, from a business perspective, Dr. Anwar's kickback scheme was a huge success. Relator estimates, and the witness Anita Owens concurs, that optometrists who received kickbacks from Dr. Anwar, referred literally hundreds of patients *per month* to Dr. Anwar's ophthalmology practice - as many as 400 patients in a single month. Relator estimates and the witness Ms. Owens concurs that, over the last 10 years, the targeted optometrists - the ones who received Dr. Anwar's massive kickbacks - have referred over 10,000 patients to Dr. Anwar. The majority of those patients are Medicare beneficiaries.

78.     Furthermore, based upon their combined 40 years of experience working with Dr. Anwar, the witness Anita Owens and the Relator estimate that about 40% of Dr. Anwar's patients came to him as referrals from optometrists who had received kickbacks from Dr. Anwar.

**B. Fraudulent Billing For Medically Unnecessary Cataract Surgeries**

79.     During the relevant time period, Dr. Anwar, in conjunction with his wholly owned medical facilities the AEC and the ACC, have knowingly presented or caused to be presented false or fraudulent claims for reimbursement from Medicare for thousands of cataract surgeries that were not medically reasonable and necessary. Medicare has paid Defendants Dr. Anwar, the AEC, and the ACC millions of dollars in false claims as a direct result of Dr. Anwar's fraudulent billings.

**1)  Cataract Surgery - A Description of Medical Necessity**

80.     Inside everyone's eyes, there is a natural lens made up mostly of water and specially arranged proteins. The purpose of the eye's lens is to bend or focus light that reaches it onto the retina, the light-sensitive tissue at the back of the eye which allows us to see. In order to

- 21 -

work properly, the lens should be clear, like window glass. A clear lens allows us to see a sharp clearly delineated image.

81.     As humans age, some of the proteins in the lens begin to clump together and may start to cloud a small area of the lens. This is a cataract. The vast majority of cataracts are simply the result of the normal aging process. Like wrinkles and reading glasses, basically everyone, if they live long enough, will develop a cataract in one or both of their eyes.

82.     It is important to note, however, that cataracts are a slowly progressing disease. Cataracts start out quite small, except in very rare instances, and progress, if at all, slowly over many years. In the beginning, cataracts usually do not affect a person's vision to any noticeable degree. As explained on the website for the American Academy of Ophthalmology: "People over age 60 usually start to have some clouding of their lenses. However, vision problems may not happen until years later." www.aao.org/eye-health/diseases/what-is-cataract-surgery

83.     Over the course of many years, however, the cataract may grow and cloud more of the lens. The increasing cloudiness may cause the affected person's vision to appear blurry, hazy or less colorful. The symptoms of early cataract development may be improved with new eyeglasses, brighter lighting, anti-glare sunglasses, or magnifying lenses.

84.     Eventually, though, a cataract may grow large enough and may adversely affect a patient's vision severely enough, that even with corrective glasses, the reasonable and medically necessary treatment may be to surgically remove the person's cloudy lens and replace it with an artificial one. This replacement procedure is what is meant by the term cataract surgery.

85.     Cataract surgery, however, is rarely an emergency or otherwise urgent. As the Mayo Clinic's website explains it: "In most cases, waiting to have cataract surgery won't harm

your eye, so you have time to consider your options. If your vision is still quite good, you may not need cataract surgery for many years, if ever."

www.mayoclinic.org/tests-procedures/cataract-surgery/about/pac-20384765

86.     If a cataract progresses to the point where, even with corrective glasses or contacts, the clouded lens makes it difficult for a patient to carry out his or her normal daily activities, a doctor may suggest cataract surgery. Under Medicare's rules for reimbursement in the State of West Virginia, if a cataract patient's corrected vision, in other words the patient's vision while wearing his or her prescription glasses or contacts, is 20/50 or worse, Medicare or Medicaid will normally pay for the patient's cataract surgery.

87.     During cataract surgery, the cloudy natural lens is removed and replaced with a clear artificial lens, called an intraocular lens (IOL). The most common method for performing cataract surgery, and the one used most often by Dr. Anwar, is known as phacoemulsification. It starts with the application of a local anesthesia to the affected eye. This anesthetizing of the eye, called blocking, is the procedure that Relator handled for Dr. Anwar when he performed cataract surgeries.

88.     Once the eye has been properly sedated, a small incision is then made in the eye itself and an ultrasonic handpiece, an electronic tool with a steel or titanium needle on the end of it, is inserted into the eye. The tip of the metal needle vibrates at an ultrasonic frequency which breaks up or emulsifies the lens containing the cataract into small pieces which are then aspirated out of the eye with the aid of a suction pump.

89.     After all remnants of the cloudy lens have been removed from the eye, the surgeon inserts a clear artificial intraocular lens (IOL) into the space left behind, positioning it securely behind the iris and pupil, in the same location the natural lens occupied. The surgeon

- 23 -

then completes the procedure by closing the incision in the eye, a stitch may or may not be needed.

90.     While cataract surgery is considered generally safe, it is still surgery, which is never risk free - and this is not just any surgery here, but one performed on the eye. As such, cataract surgery carries various risks of problems or complications. Some of those risks include:

- Eye infection.

- Bleeding in the eye.

- Ongoing swelling of the front of the eye or inside of the eye.

- Swelling of the retina (the nerve layer at the back of your eye).

- Detached retina (when the retina lifts up from the back of the eye).

- Damage to other parts of your eye.

- Pain that does not get better with over-the-counter medicine.

- Vision loss.

- The IOL implant may become dislocated, moving out of position.

### 2) Dr. Anwar's Medically Unnecessary Cataract Surgeries

91.     Medicare will pay for cataract surgery as long as it meets Medicare's definition of being medically necessary. Medicare defines cataract surgery as medically necessary when a patient is diagnosed as having a cataract *and* having corrected vision of only 20/50 or worse. What this means in practice is that, if a patient has a diagnosed cataract that is causing the patient noticeable vision loss, Medicare will pay for cataract surgery if prescription glasses or contacts cannot improve the patient's vision to better than 20/50. All of these requirements must be diagnosed and properly documented in the patient's chart.

92.     Over the last 10 years, Dr. Anwar has performed more cataract surgeries on Medicare beneficiaries than just about any other doctor in West Virginia. Not surprisingly then, over the last 10 years, Dr. Anwar, and his surgical facilities the AEC and the ACC, have received more money from Medicare for the performance of cataract surgeries, than just about any other ophthalmology practice in West Virginia. Unfortunately, as the Relator and the witness Anita Owens can both attest, a substantial percentage of these cataract surgeries, paid for by Medicare, were fraudulently billed because they did not meet Medicare's strict test for medical necessity.

93.     Dr. Anwar's scheme to fraudulently bill Medicare for medically unnecessary cataract surgeries works like this. The AEC, like most ophthalmology practices, has an optometry side and a medical practice side (where Dr. Anwar worked). When new patients come into the AEC, they first go to the optometry side to have their general eye health checked, including whether they have a cataract. The patient's vision is also checked to determine their visual acuity score and prescription for glasses or contacts.

94.     Afterwards, the patient is taken to the medical side of the practice to see Dr. Anwar. The patient is almost always brought to Dr. Anwar by one of two of his longtime employees: Mary Ann Lieser, LPN and clinic supervisor or Linda Beatty, assistant clinic supervisor. Mary Ann is a nurse and office manager for Dr. Anwar who, for decades now, has run the operations side of the AEC for Dr. Anwar. To this day, Mary Ann still runs the clinical side of the AEC for Dr. Anwar. Linda, a clinical technician handled much of the day-to-day business at the AEC for many years until she left Dr. Anwar's employment a couple of years ago.

95.     Mary Ann or Linda would bring the patient's medical chart over to Dr. Anwar. The chart should state, among other things, whether the person has a cataract and what the

patient's corrected vision score is (known as the acuity). However, Dr. Anwar strictly instructs anyone who works on the optometry side, including the optometrists, Mary Ann and, formerly, Linda, that the presence or absence of a cataract and also the patient's visual acuity score must be written on a post-it note - not on the chart itself - and placed inside the patient's chart. The visual acuity is written in a standard format, such as 20/30, 20/40, 20/60 or whatever the test on the optometry side actually determined the patient's corrected visual acuity actually is.

96.     Dr. Anwar instructs his clinicians, quite adamantly, that the visual acuity may not be written into the patient's medical chart - only on a post-it note. As Relator and Anita Owens know, Dr. Anwar insists on this protocol because he quite often falsifies the visual acuity score in order to get Medicare to falsely pay for a cataract surgery, and he does not want a paper trail in the chart itself which could be used against him.

97.     Mary Ann or Linda then confer with Dr. Anwar about the patient's surgical "needs." If the patient's corrected vision is 20/50 or worse, nothing is done to the patient's visual acuity score, and Mary Ann or Linda write the patient's accurate score into the patient's chart.

98.     At that point, Dr. Anwar addresses the patient as follows. He tells the patient the same thing each and every time: you have a cataract and you need to have it removed by cataract surgery. He tells the patient it has to be done immediately in order for you to see more clearly. He then schedules the surgery right then and there with the patient, and with Mary Ann or Linda. He tries to schedule the surgery for that very same day. The office refers to it as an SDS (same day surgery) and a remarkably high percentage of his cataract surgeries are done SDS; the others are scheduled for as soon as possible, and almost always within a few days of the initial exam.

99.     Dr. Anwar schedules the surgery as SDS on purpose - so the patient does not seek another opinion or have the surgery done by another ophthalmologist. Relator, who was often in

the room for this process, saw and heard this approach by Dr. Anwar many, many times over the years that she worked for Dr. Anwar.

100.    If the patient's corrected vision is better than 20/50, which is the case a substantial percentage of the time, Dr. Anwar intentionally lies to the patient and to Medicare in order to go ahead and fraudulently perform the cataract surgery. Relator saw this happen hundreds if not thousands of times. Since the patient's corrected visual acuity is better than 20/50, it means that the patient does not meet Medicare's standard for medical necessity and, absence fraud, Medicare will not pay for the surgery. Rather than accept Medicare's guidance, Dr. Anwar commits fraud in the following manner so that he can go ahead with the medically unnecessary surgery *and* have Medicare pay for it.

101.    Dr. Anwar tells Mary Ann or Linda to falsify the patient's acuity score and put it in the patient's medical chart as 20/50. When falsifying the patient's acuity score, he always has Mary Ann or Linda change the original, accurate score - the one on the post-it note - to the falsified score of 20/50. It's always changed to 20/50, not any other number. At the same time, Mary Ann or Linda then circle the "new" falsified score of 20/50, and next to it they hand write the initials MFA, for Mohammed Faruq Anwar.

102.    With the falsified score in hand, Dr. Anwar now addresses the patient in the exact same manner as if the patient had actually met Medicare's standard of medical necessity for cataract surgery. In other words, he lies to the patient. He tells the patient they have a cataract and that they need to have it removed by cataract surgery. He tells the patient it has to be done as soon as possible and he schedules the surgery right then, usually for the same day or within just a few days of the initial exam. Again, Relator was often in the room for this process; she saw and

heard Dr. Anwar lie to the patients in this manner many, many times over the years that she worked for him.

103.    Relator and the witness Anita Owens can both attest to the fact that they saw numerous patient charts over the years with the acuity score listed as 20/50, circled, with the initials MFA next to it. They both knew exactly what that meant from witnessing the fraudulent billing scheme firsthand and from being longtime senior employees of Dr. Anwar's ophthalmology practice who heard Dr. Anwar and confidants discuss it in their presence. The Relator, Anita Owens, Mary Ann Lieser, and Linda Beatty, along with a number of other senior, longtime employees in Dr. Anwar's practice, including the optometrists and other clinicians in his office, all know firsthand all about Dr. Anwar's fraud. They know that if the patient's corrected vision was actually better than 20/50, there would be a circle around the score of 20/50 with the initial MFA next to it; they know this means that Dr. Anwar had instructed his assistants to change the patient's vision score to 20/50; they know that this means Dr. Anwar personally decided to go ahead and perform the cataract surgery even though it was not medically necessary according to the rules laid out by Medicare; and they know that Dr. Anwar went ahead and fraudulently billed Medicare for the cataract surgery.

104.    Overall, Dr. Anwar performed cataract surgery on thousands of patients, the vast majority of them Medicare beneficiaries, who did not meet Medicare's bright-line rule for medical necessity. Dr. Anwar then billed Medicare for those surgeries, lied on the reimbursement form about the medical necessity of the surgery, and Medicare paid him millions of dollars for those fraudulently billed cataract surgeries.

105.    The connection between Dr. Anwar's illegal kickback scheme and his medically unnecessary cataract surgeries is the obvious one: Dr. Anwar performed cataract surgeries at a

much higher rate on those patients who had been referred to him by optometrists who had received his kickbacks. As alleged above, Relator estimates that approximately 40% of Dr. Anwar's patients came to him as referrals from optometrists who had received kickbacks from Dr. Anwar. In order to recoup the substantial amounts of money that he lavished on the targeted optometrists, Dr. Anwar made sure to convince as many of these illegally referred patients as possible, that they needed cataract surgery. And, as Relator directly observed, he was quite successful at doing so.

106.    Toward the end of her employment with Dr. Anwar, Relator also began to see a very disturbing trend among Dr. Anwar's surgical patients; one that eventually led to her departure from her employment with Dr. Anwar. Throughout her tenure, Relator observed Dr. Anwar's scheme to operate on Medicare patients who were not medically ready to have their cataracts surgically removed. Dr. Anwar did it anyway and made millions of dollars from Medicare by defrauding the agency into paying for surgeries that were not medically necessary. More recently, however, Relator saw firsthand how Dr. Anwar would perform cataract surgery on patients who did not even have cataracts. As his nurse anesthetist, she worked side-by-side with Dr. Anwar as he performed the phacoemulsification procedure to break up the patient's natural lens. She could observe firsthand that an increasing number of patients did not even have cataracts, but Dr. Anwar was surgically removing the patient's lens anyway and replacing it with an artificial one.

107.    Finally, as discussed above, no surgery, especially one on a patient's eye, is without risk. Cataract surgery is a trauma to the eye that can result, among other things, in infections, bleeding, swelling, damaged or detached retina, or vision loss. Medicare balanced those risks and the cost of the surgery against the benefit to a patient's vision from the removal

of the cataract, and came up with its rule on when it considered cataract surgery to be medically necessary. Defendants fraudulent behavior blatantly flouts Medicare's carefully reasoned rule and, while not only defrauds the government out of millions of dollars, it places his patients at greater risk of serious injury or harm.

**COUNT I**

**Violations Of 31 U.S.C § 3729(a)(1)(A)**

108.    Relator, on behalf of the United States, re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

109.    During the relevant period, Defendants presented or caused to be presented numerous claims for payment to the United States Government through Medicare and Medicaid.

110.    For the reasons alleged herein, many of these claims were knowingly false and fraudulent within the meaning of the FCA. More specifically, Defendant knowingly presented or caused to be presented, to an officer and employee of the United States Government false and fraudulent claims for payment and approval in violation of 31 U.S.C. § 3729(a)(1)(A).

111.    Defendant had actual knowledge of the falsity of these claims, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the FCA.

112.    The United States suffered damages as a result of false claims by Defendant and is entitled to recover its losses and obtain other relief available under the FCA.

**COUNT II**

**Violations Of 31 U.S.C § 3729(a)(1)(B)**

113.    Relator, on behalf of the United States, re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

114.    During the relevant period, Defendant presented numerous records and statements to the United States Government through Medicare and Medicaid.

115.   For the reasons alleged herein, many of these records and statements were knowingly false and fraudulent within the meaning of the FCA.  More specifically, Defendants knowingly made, used, and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(B).

116.   Defendants had actual knowledge of the falsity of these statements, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the FCA.

117.   The United States suffered damages as a result of false records and statements by Defendant and is entitled to recover its losses and obtain other relief available under the FCA.

**PRAYER FOR RELIEF**

WHEREFORE, Relator, on behalf of the United States, prays for judgment pursuant to the FCA as follows:

(a)   For judgment against Defendants and in favor of the United States for treble damages, expenses, attorneys' fees, and costs in connection with this action;

(b)   For judgment against Defendants and in favor of the United States for civil penalties in statutorily-determined amounts for each false claim;

(c)   For an award to Relator for the maximum qui tam relator's portion permitted under the FCA; and

(d)   For an award to Relator for his reasonable expenses, attorneys' fees, and costs incurred in connection with this action.

## JURY REQUEST

Relator hereby requests trial by jury.

Dated: August 20, 2018

_____ /s/ *Guy R. Bucci*

Guy R. Bucci, Esquire (WVSB #0521)
Raj A. Shah, Esquire (WVSB #11269)
HENDRICKSON & LONG, PLLC
P. O. Box 11070
Charleston, WV  25339
(304) 346-5500
gbucci@handl.com
rshah@handl.com

--AND--

Kirk E. Chapman (*pro hac vice* forthcoming)
**Kirk Chapman Law LLC**
kirkchapmanlaw@gmail.com
415 East 37th St. #29K
New York, NY  10016
Telephone: (917) 742-0402

*Attorneys for Plaintiff-Relator Karen Champion*

- 32 -